UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,                    **REPORT AND**
                                             **RECOMMENDATION**
v.
                                             14-CR-00197(LJV)(JJM)
ELIJAH IVERSON,

                        Defendant.
_____

        Defendant Elijah Iverson is charged in a five-count Superseding Indictment [10][1]

with, *inter alia*, possessing cocaine and marijuana with intent to distribute, in violation of 21

U.S.C. §841(a)(1).  This case was originally referred to me by Hon. Richard J. Arcara for

supervision of all pretrial proceedings [2], and has since been reassigned to Hon. Lawrence J.

Vilardo [56].

        Before me is Iverson's motion to suppress the physical evidence seized from his

apartment on October 22, 2014 pursuant to an allegedly unlawful search, as well as to suppress

the statements that he allegedly made during that encounter.  Scott Affirmation [18], Point I.  His

motion further seeks to suppress physical evidence seized from his apartment on October 23,

2014 pursuant to a search warrant issued by Town of Tonawanda Justice Mark Gruber.  Id.[2]

        A suppression hearing was held on June 18, and July 20, 2015, at which Town of

Tonawanda Police Officers Brent Costello, Jason Arlington, and Frank Bartolotta testified for the

government [46, 47].  Following the hearing, the parties submitted post-hearing briefs

_____

[1]        Bracketed references are to CM/ECF docket entries.

[2]        Iverson's counsel has advised my chambers that the remaining portions of Iverson's pretrial
motion [18] are resolved.

[52, 53, 54, 55], and oral argument was held before me on November 17, 2015 [58].  For the

following reasons, I recommend that the motion be denied.


# BACKGROUND

On October 22, 2014, Iverson placed a 911 call at 10:13 p.m. reporting that a

black male wearing a black hoodie attempted to enter 601 Kenmore Avenue, a two-unit

apartment building, and may have had a weapon.  Gov. ex. 9; June 18, 2015 hearing transcript

[46], pp. 80-81; July 20, 2015 hearing transcript [47], p . 45.  Earlier that evening, a robbery was

reported nearby involving an individual matching the description provided by Iverson. [47], pp.

9-10, 46. Officer Costello, who was assigned to the K-9 division with his dog Tank,[3] attempted

to track the suspect in the earlier robbery, but was unsuccessful.  [46], pp. 6, 11-12.

Officer Bartolotta, a patrol officer, and his partner Officer Mark Muscoreil were

dispatched to Iverson's 911 call at 10:14 p.m., and were the first officers to arrive at the scene at

10:18 p.m. [47], pp. 45, 46-47.  While Officer Muscoreil checked the perimeter and interior of

the building, Officer Bartolotta went to Iverson's apartment to speak with him (id., pp. 47-49).

Iverson told Officer Bartolotta that he had met a female named Candy at the liquor store around

the corner and believed that he had been set up to be robbed (id., pp. 49-50).  Officers Bartolotta

and Muscoreil later left the scene to check the video surveillance at the liquor store "hoping that

it was going to be the same person as the previous robbery . . . because the descriptions were

very similar" (id., pp. 50, 52).  When asked why they left the area unsecured, Officer Bartolotta

---

[3]       Tank is a "dual purpose" canine that has the ability to perform patrol and detection work. [46],
pp. 90-91.  Officer Costello and Tank initially completed a 15-week training program in or about
December 2009 for Tank to become certified as a service K-9 (id., pp. 7-8). They then completed regular
maintenance training and recertifications twice a year (id., p. 8; gov. exs. 7 and 8 [45-9, 45-10]).

testified that "[i]t wasn't essentially a crime scene at that point . . . . because from what was reported to us, the man and Candy were seen in the hallway. . . on the first . . . landing . . . . and no weapon was ever pointed at Mr. Iverson, he didn't say . . . a threat was made or anything. It was just he said that they left" (id., pp. 50-51).

When Officers Bartolotta and Muscoreil failed to observe Candy in the surveillance video from the liquor store, Officer Bartolotta started to question Iverson's story (id., p. 52). After reviewing the surveillance video, they returned to 601 Kenmore Avenue and updated Lieutenant Price (id.).

Officer Arlington, a patrol officer, arrived at the scene of Iverson's 911 call between 10:30 and 10:45 p.m. (id., pp. 9, 17-18). He testified that Officers Bartolotta and Muscoreil briefed him on "where the gentlemen that had the gun went and they said they were going to the liquor store to try to get some evidence from there" (id., p. 9). However, Officer Bartolotta testified that he had no direct communications with Officer Arlington (id., p. 53). He testified that he communicated everything to Lieutenant Price, who informed Officer Muscoreil, and that Officer Muscoreil relayed the information to Officer Arlington (id., p. 54). He knew from what they told him that the suspect never made it into Iverson's apartment (id., p. 26). Officer Arlington kept the area secure until Officer Costello arrived (id., p. 19).

Officer Costello arrived at approximately 11:00 p.m. in response to a call from Lieutenant Price requesting his assistance with an incident where a suspect may have fled on foot after displaying a gun ([46], pp. 12-13, 60, 67, 71), and was briefed at the scene by Officer Arlington. [47], pp. 9-10, 20, 21. That briefing included Officer Arlington telling Officer Costello what Officers Bartolotta and Muscoreil were doing (id., p. 20).

Officer Arlington testified that Officer Costello's  sole purpose was to track the suspect on the outside of apartment building (id.).  Officer Costello traced the perimeter of the apartment building and adjacent areas, but after approximately 45 minutes was unable to locate a workable odor for Tank to track. [46], pp. 14-16, 63, 67, 75-77, 103.  He then directed Tank to conduct an article search to locate any discarded firearm, but he did not locate anything (id., pp. 16-17, 78).  Officer Arlington testified that he remained with Officer Costello while he attempted to track the suspect, but he characterized it as not being "a long track", and could not recall if they also did an article search. [47], pp. 23-25.

Since he was unable to track a suspect or locate a firearm, Officer Costello testified, "I told Officer Arlington I wanted to go upstairs and talk with the complainant and see if he could give us any further information on  . . . where the suspect might have ran to or gone. A lot of time when . . . stuff is given to dispatch on the phone, not all the information gets out . . . . So I wanted to do one . . . last ditch effort to try to find the guy that had a gun . . . . [M]aybe he saw him run somewhere . . . when he's looking out the window after the guy left . . . I wanted to exhaust the search as best I could for the suspect".  [46], pp. 18-19, 22-23, 80; [47], p. 11.  Officer Costello testified that he was not told that officers believed that Iverson was lying about the incident.  [46], p. 70.

When Officers Costello, Englert and Arlington, along with Tank, proceeded to Iverson's second floor apartment his apartment door was open, and Officer Arlington called out for Iverson and knocked. [46],  pp. 19, 83; [47], pp. 12, 28.   Iverson responded, "come in, it's open". [46], pp. 19-20, 83; [47], pp. 12, 28-29.  Although Officer Costello did not initially observe Iverson, when Officer Arlington identified themselves, Iverson "came to the door at the

same time and everyone walked into the apartment". [46],  p. 83.  Officers Arlington and Englert

entered first, followed by Officer Costello with Tank tethered to his gun belt on a four foot leash.

[46], pp. 20, 27; [47], p. 28.  Tank remained tethered to Officer Costello's side. [46], p. 26.

Officer Costello testified that he keeps Tank with him whenever he can, and that in this instance

he also took Tank to Iverson's apartment for officer safety, since he did not know if the suspect

had secreted himself in the apartment or apartment building. [46], pp. 20, 84; [47], p. 27.

However, he conceded that he did not have any reason to believe that the suspect was in

Iverson's apartment. [46], p. 82.

Although Iverson was not told that the officers were entering the apartment with a

drug detection dog, he had a clear line of sight to Tank when they entered his apartment and

made no objection to the dog's entry (id., pp. 22, 83-85).  Officer Costello believed that Iverson

said "you guys were just here", and that Officer Arlington told him that, "the patrol guys that

originally were handling it were here, we're following up on something else" (id., p. 21).  Officer

Arlington then attempted to obtain information from Iverson about "another possible spot the

suspect had run from or to". [46], p. 26; [47], p. 12.

Officer Costello did not have any discussion with Iverson; he and Tank remained

in the "hallway entrance area" within the apartment. [46], pp. 26-27, 45, 85, 99.  Officers

Arlington and Englert and Iverson were in the living room (id., p. 44). From his location in the

living room, Iverson was able to observe Tank (id., p. 26).

Officer Costello testified that in order to command Tank to search for drugs he

uses the word "dope", followed by a throwing motion (id., p. 23).  He denied giving that

command to Tank either inside or outside of Iverson's apartment (id., pp. 23-24).  Nevertheless,

after being in Iverson's apartment for approximately five minutes, Tank started to get very

excited and bark, which Officer Costello determined was an alert to the odor of narcotics (id., pp.

27-28, 86-87).  At that point, he told Officer Arlington  what was occurring. [46], pp. 29, 44-45;

[47], p. 31.  Iverson was told that "there's something in here that shouldn't be in here", and was

asked what it was.  [46], pp. 29, 46, 91-92.  Iverson eventually responded that he had an eighth

of an ounce of marijuana in the apartment, and when he was asked where it was located, he

motioned to the kitchen.  [46], pp. 30, 46, 92-93; [47], p. 13.  Both Officers Costello and

Arlington followed Iverson to the kitchen, where he opened a drawer.  [46], p. 30; [47], pp. 13,

31-32.  As he was removing a bag of marijuana, Officer Costello was looking into the drawer to

ensure that Iverson did not pull out a weapon and observed a scale. [46], pp. 31-32; [47], p. 13.

When Iverson attempted to shut the drawer, Officer Costello asked him "what else was in the

drawer", and he responded that it was "his personal stuff . . . . [a]nd he was trying to basically

keep that because he didn't want to give it up.  That was the good stuff". [46], pp. 30-31.

However, Officer Costello said "we're going to take that, too" (id., p. 31).  Inside the drawer was

a scale and two more bags of marijuana (id., pp. 31-33).

Iverson then returned to the living room and was told by Officer Costello that he

believed that  there were more narcotics in the apartment, and that he was "going to get  a search

warrant if  [he] had to finish searching the apartment" (id., pp. 31-32).  At that point, Iverson

"dropped his shoulders, shrugged and said he has a little powder" (id., p. 32).  When Iverson was

asked where it was located, he led the officers back to the kitchen and pulled out a bag of cocaine

from a drawer adjacent to the one that contained the marijuana (id.).  Officer Costello could see a

larger baggie containing a white substance, and asked Iverson "what's that?" (id., p. 33).  Iverson

stated that it was "cutter", and gave him everything contained in the drawer (id., pp. 33-34, 47-48).

Officer Costello next asked Iverson for consent to search his apartment, telling him, "if I don't get consent . . . I'll go for a search warrant and we'll go from there". [46], pp. 34-35. He also told Iverson, that he "would issue him an appearance ticket . . . if we had consent to search as long as it wasn't . . . a felony level amount of narcotics", but that if he obtained a warrant, "there's going to be no appearance tickets, you will go back to the station, they're going to secure the apartment and based on whether a warrant is issued or not, the search will be continued" (id., p. 35, 49-50). Iverson did not consent to the search (id., pp. 36-37, 48).

The officers proceeded to confirm, by use of a field test, that the substance they recovered was cocaine (id., pp. 37, 50). Whereas Officer Arlington testified Iverson was placed in cuffs and arrested prior to the field test ([47], p. 14), Officer Costello testified that after the field test confirmed that it was cocaine, he called his Lieutenant and Iverson was placed under arrest. [46], p. 38. An officer was posted at the apartment to secure the premises until a search warrant could be obtained (id.).

At 11:23 p.m. Officer Bartolotta began typing his report (def. ex. A [45-11]) in his vehicle while at the scene. [47], pp. 54-55, 60. In his report, he stated that "[i]t appears as though Iverson is selling drugs out of the apartment. His account of what happened is vague. Upon watching the Kenmore Liquor footage, Iverson's account is also untrue. It was later reported to me that a large amount of drugs were found in the apartment. (see Ofc Costello's supplement)". Def. ex. A [45-11]. Officer Bartolotta testified that he made changes to his

report during the "five - - or probably 20 minute period that [he] wrote it", and probably left the

scene before the conclusion of his shift at midnight. [47], pp. 55, 60.

      Although Officer Bartolotta initially testified that he reached the conclusion that

Iverson was selling drugs while sitting at the scene typing in his vehicle, and that it was

confirmed by the events that transpired thereafter ([47], p. 55), he later gave the following

testimony:

> "Q.    Where did you -- when you say 'it appears as though Iverson is selling
> drugs out of the apartment,' how did you draw that conclusion or that
> belief?
>
> A.    Because the next line there where it says, it was later reported to me that a
> large amount of drugs were found in the apartment, see the supplement.
> That's -- at the time of typing this is where that came from. It was a very
> different scene when we returned from the liquor store.
>
> Q.    Okay. So when you returned from the liquor store had you received
> information that . . . others had found some narcotics in the apartment?
>
> A.    Yes, I believe at that point is when we heard it . . . . We didn't know that at
> any point until the very – pretty much the very end.
>
> Q.    All right. So you arrived back to the scene and you find out that someone
> found some drugs in his apartment?
>
> A.    Yes.
>
> Q.    And that's -- after that is when you wrote this?
>
> A.    Correct" (id., pp. 58-59).

Officer Bartolotta also initially testified that he believed that Officer Costello was tracking the

suspect when he began typing his report (id., p. 54), but later testified that he did not know what

Officer Costello was doing when he began writing his report (id., pp. 59-60).

Officer Costello denied that Iverson was a suspect or that he had any ulterior motives in going to Iverson's apartment. [46], pp. 23, 108-09.  Both he and Officer Arlington denied that they went to Iverson's apartment to search for drugs or other contraband. [46], p. 23; [47], p. 16.

Officer Arlington testified that he transported Iverson back to the station, and that on the way Iverson spontaneous said, "man, they're really gonna tear up my apartment, aren't they, Officer?".  [47], p. 15.  Officer Arlington responded by telling Iverson that "they don't just tear up your apartment unless the K-9 alerts to something and if he alerts it's possible that something that they can't get at that they would have to go in and damage something depending on where it is", and Iverson replied, "I'm f*****, I have to find somewhere else to move" (id.).

The next morning a search warrant was obtained for Iverson's apartment from Justice Gruber, which was erroneously dated October 23, 2013. [46], pp. 39, 43; gov. ex. 5 [45-7]). The search warrant was supported by Officer Costello's Affidavit, which described the events of the previous evening.  Gov. ex. 4 [45-6].  During the search of Iverson's apartment on October 23, 2014, crack cocaine, two large baggies of marijuana, $675.00, and an assault rife with ammunition were seized.  Gov. ex. 6 [45-8].

Although Iverson elected not testify at the suppression hearing, he submitted an Affidavit ([19], pp. 2-3 of 3) in support of his motion stating the following:

- "I did not authorize law enforcement to search my apartment" (id., ¶3);

- "I did not voluntary speak to law enforcement" (id., ¶4); and

- "At no time was I advised of my *Miranda* rights" (id., ¶5).

## ANALYSIS

### A.  Suppression of Evidence

### 1.        Did a Fourth Amendment Search Occur?

"The Fourth Amendment prohibits only *unreasonable* searches. The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations. " Grady v. North Carolina, __ U.S. __, 135 S. Ct. 1368, 1371 (2015) (emphasis in original).  Determination of this issue turns, in part, on the credibility of the officers' testimony.  "It is within the province of the district court as the trier of fact to decide whose testimony should be credited . . . . And as trier of fact, the judge is entitled, just as a jury would be . . . to believe some parts and disbelieve other parts of the testimony of any given witness." Krist v. Kolombos Rest. Inc., 688 F.3d 89, 95 (2d Cir. 2012).  While there were some inconsistencies between the officers' testimony, having observed their demeanor and considering their testimony as a whole, I find them to be generally credible.

Iverson draws heavily upon the Supreme Court's decision in Florida v. Jardines, __ U.S., __ 133 S.Ct. 1409 (2013) to argue that the dog sniff of his apartment constituted a search in violation of the Fourth Amendment.  Iverson's Post-Hearing Memorandum [53], pp. 7-8.  In Jardines, law enforcement obtained a tip that marijuana was being grown at the defendant's residence. 133 S.Ct. at 1413.  Once it was determined by a surveillance team that there was no activity at the residence, a drug-sniffing dog was brought to the scene and searched around the house until giving a positive alert at the front door, which was used to obtain a search warrant for

the residence.  Id.  The Supreme Court granted certiorari on the limited question "of whether the

officer's behavior was a search within the meaning of the Fourth Amendment".  Id. at 1412.

Resolution of  "whether the officer's conduct was an objectively reasonable search . . .

depend[ed]  upon whether the officers had an implied license to enter the porch, which in turn

depend[ed] upon the purpose for which they entered."  Id. at 1416–17.

Recognizing that "[t]he scope of a license - express or implied - is limited not

only to a particular area but also to a specific purpose", the Supreme Court explained that

whereas there is an implied license to approach a home's entry and "wait briefly to be received,"

there is "no customary invitation" to deploy "a trained police dog to explore the area around the

home in hopes of discovering incriminating evidence".  Id. at 1416.  Concluding that the

officer's "behavior objectively reveals a purpose to conduct a search, which is not what anyone

would think he had license to do", the Supreme Court concluded that a Fourth Amendment

search had occurred.  Id. at 1447. [4]

In arguing that no Fourth Amendment violation occurred here, the government

contends that the officers' "entry was invited and not an unreasonable search".  Government's

Post-Hearing Memorandum of Law [52], p. 6 (emphasis omitted).  Iverson responds that "the

scope of [his] license for the officers to enter his home was limited to [the officers'] entry (and

not Tank's)".  Iverson's Post-Hearing Response [54], p. 7.  I disagree.  Crediting Costello's

testimony that Iverson observed Tank enter his apartment and remain without objection,  Tank

---

[4]        More than 25 years before Jardine, the Second Circuit in United States v. Thomas, 757 F.2d
1359, 1367 (2d Cir. 1985), cert. denied, 474 U.S. 819 (1985), reached the same conclusion on a
reasonable expectation of privacy theory:  "[T]he officers' use of a dog is not a mere improvement of
their sense of smell, as ordinary eyeglasses improve vision, but is a significant enhancement
accomplished by a different, and far superior, sensory instrument. Here the defendant had a legitimate
expectation that the contents of his closed apartment would remain private, that they could not be 'sensed'
from outside his door. Use of the trained dog impermissibly intruded on that legitimate expectation."

had an implicit license to enter.  *See* <u>United States v. Grant</u>, 375 Fed. App'x. 79, 80 (2d Cir)

(Summary Order), <u>cert.</u> <u>denied</u>, 562 U.S. 1006 (2010) ("[T]he police officers had Grant's implied

consent to enter his apartment", where  "Grant responded to the [officers'] identification and

request to talk by admitting the officers into the building and turning toward his apartment.   As

the officers followed, Grant entered his apartment without impediment or objection to the entry

of the police").  Nevertheless, the terms of that invitation were not unbridled.  *See* <u>Jardines</u>, 133

S.Ct. at 1447.  As Iverson argues, the "terms of [that] consent were for the officers' entry into his

apartment to discuss the assailant with the handgun, not a generalized search of his apartment

with a drug-detection canine".  Iverson's Post-Hearing Response [54], p. 3.

Next, I must determine whether the officers exceeded the limited scope of

Iverson's invitation to enter by conducting a search.  The government argues that "the only

'search' that Tank was commanded to undertake was away from the defendant's apartment and

was in furtherance of locating the man with the gun that the defendant had called 911 about".

Government's Post-Hearing Memorandum of Law [52], p. 11.  It emphasizes that, "[a]t no time

did Costello give Tank his command to search for drugs".  Government's Post-Hearing Reply

Memorandum of Law [55], p. 6 (emphasis omitted).

Here, I credit Officer Costello's and Arlington's testimony that they did not enter

Iverson's apartment to search for drugs or other contraband. [46], p. 23; [47], p. 16.  In any

event, "even if there were . . .  evidence [of an improper motive], the officer's subjective motive

is not grounds for suppression. '[T]he fact that the officer does not have the state of

mind . . . which [would] provide the legal justification for the officer's action does not invalidate

the action taken as long as the circumstances, viewed objectively, justify that action.'" <u>United</u>

States v. Gandia,  276 F. App'x 10, 12 (2d Cir.) (Summary Order), cert. denied, 555 U.S. 930

(2008) (*quoting* Scott v. United States, 436 U.S. 128, 138 (1978)).

       Unlike in Jardines, the conduct here does not objectively reveal that its purpose

was to conduct a search:  Officer Costello never directed Tank to locate narcotics, he and Tank

remained near the door of the apartment, and prior to Tank's positive alert, the discussion with

Iverson focused on locating the reported suspect.

       Although Tank alerted to narcotics during the consensual entry, "[a] trespass on

'houses' or 'effects,' or a[n] . . . invasion of privacy, *is not alone a search unless it is done to*

*obtain information*".  United States v. Jones, __ U.S.__, 132 S. Ct. 945, 951 n.5 (2012)

(emphasis added).  Thus, "[i]f a police dog is acting without assistance, facilitation, or other

intentional action by its handler . . .  it cannot be said that a State or governmental actor intends

to do anything.  In such a case, the dog is simply being a dog. If, however, police misconduct is

present, or if the dog is acting at the direction or guidance of its handler, then it can be readily

inferred from the dog's action that there is an intent to find something or to obtain information."

State v. Miller, 367 N.C. 702, 713 (N.C. Sup. Ct. 2014).  *See also* United States v. Reed, 141

F.3d 644, 650 (6th Cir. 1998) ("absent police misconduct, the instinctive acts of trained

canines . . .  does not violate the Fourth Amendment"); United States v. Rivera, 89 F.Supp.3d

376, 414 (E.D.N.Y. 2015) ("although the Second Circuit has yet to decide the issue, several

appeals courts have held that no constitutional violation has occurred where a canine's entry into

the car was instinctual rather than orchestrated" (citing cases)).

       Iverson argues that Tank's alert to narcotics was not instinctual since that conduct

was "learned through extensive certification and training".  Iverson's Post-Hearing Response

-13-

[54], p. 5.  However, in United States v. Sharp, 689 F.3d 616, 620 (6th Cir.), cert. denied, 133 S.Ct. 777 (2012), the court rejected a similar argument:  "Defendant argues that the dog's jump was not 'instinctive' because the dog was trained to sniff for drugs and that by jumping into the car, he was merely carrying out that training. This argument misinterprets the term training.  Of course, narcotics detection canines are trained to sniff for drugs, and the dog jumped into Sharp's car because he was sniffing for and smelled drugs.  Thus, on some level, the dog jumped into Sharp's car because of his training.  But while it is a Fourth Amendment violation for a narcotics canine to be trained to jump into cars, it is not a Fourth Amendment violation for a dog to jump into a car on its own volition and instinct when sniffing for drugs, as long as the dog's behavior has not been facilitated by law enforcement.  This inquiry focuses on the police's conduct in training the dog before the search and the officers' conduct during the search. It is a Fourth Amendment violation for a narcotics detection dog to jump into a car because of something the police did, like training the dog to jump into cars as part of the search or facilitating or encouraging the jump."

Here, there is no indication that Tank's alert to narcotics while consensually present in Iverson's apartment was anything but instinctual.  Nothing in the record establishes that Tank was known (or trained) to alert to narcotics without receiving the specified  command from his handler.  Therefore, I conclude that no Fourth Amendment violation occurred, and recommend that this portion of Iverson's motion be denied.  However, if my recommendation is determined to be erroneous, I have analyzed the government's alternative reliance on the good-faith exception of United States v. Leon, 468 U.S. 897 (1984).

2. **Would the <u>Leon</u> Good-Faith Exception Prevent Suppression of the Evidence Seized Pursuant to the Search Warrant?**

The government argues that the <u>Leon</u> good-faith exception to the exclusionary rule applies even if Justice Gruber's search warrant should not have been issued. *See* Government's Post- Hearing Memorandum of Law [52], pp. 11-12. I agree.

Suppression is to be the "last resort, not [the court's] first impulse". <u>Herring v. United States</u>, 555 U.S. 135, 140 (2009). "Thus, in <u>United States v. Leon</u>, the Supreme Court recognized an exception to the exclusionary rule for 'evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant.'" <u>United States v. Clark</u>, 638 F.3d 89, 99 (2d Cir. 2011) (*quoting* <u>Leon</u>, 468 U.S. at 922. "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance' on an invalidated warrant . . . . In assessing whether it has carried that burden, we are mindful that . . . that most searches conducted pursuant to a warrant would likely fall within its protection." <u>Id</u>. at 100. "[A]gainst this presumption of reasonableness", four circumstances have been identified where the good faith presumption of reasonableness will not apply to preserve evidence from suppression: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." <u>Id</u>.

Relying on <u>United States v. Vasey</u>, 834 F.2d 782, 789 (9th Cir. 1987), Iverson appears to argue that if the initial warrantless search by Tank violated the Fourth Amendment, the <u>Leon</u> good-faith exception would be inapplicable to Justice Gruber's subsequently signed search warrant that relied on the evidence from that search. *See* Iverson's Post-Hearing

Response  [54], pp. 9-10.   In Vasey, the Ninth Circuit concluded "that the magistrate's consideration of the evidence does not sanitize the taint of the illegal warrantless search. A magistrate's role when presented with evidence to support a search warrant is to weigh the evidence to determine whether it gives rise to probable cause.  A magistrate evaluating a warrant application based in part on evidence seized in a warrantless search is simply not in a position to evaluate the legality of that search."  It further noted "[t]he constitutional error was made by the officer in this case, not by the magistrate as in Leon. . . .  [C]onducting an illegal warrantless search and including evidence found in this search in an affidavit in support of a warrant is an activity that the exclusionary rule was meant to deter."  Id.  See also 1 Wayne R. LaFave, Search and Seizure § 1.3(f) (5th ed. 2015) (a magistrate judge does "not endorse past activity; he only authorize[s] future activity").

Notwithstanding the rationale of Vasey, this Circuit has taken a different view. As the government notes, in Thomas, the Second Circuit held that a canine sniff violated the Fourth Amendment and that without that evidence, probable cause was lacking for a subsequently issued searched warrant, but nevertheless held that Leon prevented the exclusion of the evidence:   "The DEA agent brought his evidence, including the positive 'alert' from the canine, to a neutral and detached magistrate. That magistrate determined that probable cause to search existed, and issued a search warrant.  There is nothing more the officer could have or should have done under these circumstances to be sure his search would be legal. The magistrate, whose duty it is to interpret the law, determined that the canine sniff could form the basis for probable cause; it was reasonable for the officer to rely on this determination. The Leon Court announced a 'good faith' exception to the exclusionary rule, and we find that the exception

applies to this case." Id. at 1368.  *See* Government's Post-Hearing Memorandum of Law [52], pp. 11-12.

When later confronted with the conflict between Vasey and Thomas, the Second Circuit declined to reconsider "the Thomas principle that in cases where '[t]here [was] nothing more the officer could have done under these circumstances to be sure his search would be legal' . . . the evidence need not be excluded". United States v. Reilly, 76 F.3d 1271, 1282 (2d Cir. 1995).  *See also* United States v. Fugate, 499 Fed. Appx. 514, 519  (6th Cir. 2012) ("[T]he good-faith exception applies, even if a warrant is based on an illegal predicate search, where 'the facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable'"); United States v. Fletcher, 91 F.3d 48, 51 (8th Cir. 1996), cert. denied, 520 U.S. 1121 (1997) ("This circuit has held Leon applicable to the subsequent warrant-authorized search of a bag where the original detention violated the Fourth Amendment . . . .  The relevant inquiry is whether the facts surrounding reasonable suspicion are close enough to the line of validity that the police officers were entitled to a belief in the validity of the warrant and the existence of reasonable suspicion").

Iverson argues that to ensure that the search was legal, Officer Costello could have advised Justice Gruber in his search warrant application that there was "no legitimate purpose for taking Tank into Mr. Iverson's apartment and that he did not seek or obtain permission from Mr. Iverson to being the drug-detecting canine into the apartment".  Iverson's Post-Hearing Response [54], p. 10.  I disagree.  I credit Officer Costello's testimony that he had no ulterior motive for entering Iverson's apartment and that  legitimate purposes existed for why

-17-

Tank accompanied him - namely, where possible,  he regularly took Tank with him when on duty, and in this instance he also provided a measure of protection in that they had not located the suspect.  [46], pp. 20, 81-82.  Moreover, given Iverson's implied consent to Tank's entry and the fact that he was not brought into the apartment for the purpose of conducting a search, there was no reason for Officer Costello to include in the search warrant application that he did not seek or obtain Iverson's permission to bring Tank into the apartment.

"[T]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system".  Herring , 555 U.S. at  144.  Therefore, "[t]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence".  Id.  Since I conclude that there was no deliberate, reckless, grossly negligent, or systemically negligent disregard of Iverson's Fourth Amendment rights, the exclusionary rule would not apply.

## B.  Suppression of Statements

Iverson argues that his statements must be suppressed because they were involuntary and the product of a custodial interrogation without the benefit of Miranda warnings. Iverson's Post-Hearing Memorandum of Law [53], pp. 20-22.[5]  Resolution of this portion of Iverson's motion also turns, in part, upon the credibility of the officers' testimony.  Although Iverson submitted an Affidavit stating that his statements were not voluntary ([19], ¶4),[6] "[t]he weight to be accorded to the defendant's affidavit is well within the discretion of the finder of

---

[5]      Iverson also argues that his October 22, 2014 statements must be suppressed as fruit of the illegal search. Iverson's Post-Hearing Memorandum of Law [53], p. 20.  However, having concluded that no Fourth Amendment violation occurred, it is unnecessary for me to address that argument.

[6]      Although Iverson also states that he was not Mirandized ([19], ¶5), that issue is not in dispute.

fact". <u>United States v. Muhammad</u>, 2012 WL 6021458, *5 (E.D.N.Y.), <u>adopted</u>, 2012 WL

6043589 (E.D.N.Y. 2012).   "Absent his live testimony and the opportunity for cross-

examination, the Court cannot assess his credibility or truthfulness." <u>United States v. Chisholm</u>,

2008 WL 5453242, *2 (E.D.N.Y. 2008), <u>adopted as modified</u>, 2009 WL 299313 (E.D.N.Y.

2009).   Therefore, "I credit the testimony of the live witnesses over the contents of defendant's

affidavit where a conflict exists." <u>Id</u>. *See also* <u>United States v. Romano</u>, 2013 WL 5278420,*5

(E.D.N.Y. 2013); <u>United States v. Choudhry</u>, 24 F.Supp.3d 273, 275 n. 1 (E.D.N.Y. 2014).


       **1.**       **Were Iverson's Statements Voluntary?**

       "[T]he prosecution must prove by at least a preponderance of the evidence that

the confession was voluntary". <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972). "A statement is not

voluntary if it is obtained by any type of physical or psychological coercion or by improper

inducement so that a defendant's will was overborne." <u>United States v. Connelly</u>, 2007 WL

3124538, *8 (W.D.N.Y. 2007) (Siragusa, J.).

       In determining whether a statements is voluntary, courts to look to "the totality of

the circumstances surrounding the statements". <u>United States v. Siddiqui</u>, 699 F.3d 690, 707 (2d

Cir. 2012), <u>cert</u>. <u>denied</u>, __U.S. __, 133 S.Ct. 2371 (2013). "In applying the totality of the

circumstances test, those factors that a court should consider . . . center around three sets of

circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3)

the conduct of law enforcement officials." <u>Green v. Scully</u>, 850 F.2d 894, 901-02 (2d Cir.), <u>cert</u>.

<u>denied</u>, 488 U.S. 945 (1988).

Iverson argues that "Officer Costello expressly asked [him] for permission to search the residence for narcotics multiple times . . . .[but] [e]ach time [he] declined". Iverson's Post-Hearing Memorandum of Law [53], p. 17. By repeatedly retaining sufficient free will to refuse Officer Costello's requests to search, Iverson cannot credibly claim that any of his statements were involuntary. *See* United States v. Newton, 2012 WL 170008, *5 (D.Vt. 2012) ("in the face of the agents' questioning, Defendant maintained the firearm was intended only for home protection and not for use in a drug distribution business or for intimidation, thus evidencing his retention of his free will"); United States v. Willis, 2006 WL 2239738, *6 (W.D.N.Y. 2006) (Larimer, J./ Feldman, M.J.) ("Indeed, the fact that Willis refused to sign the Miranda waiver form when requested by Officer Post is persuasive evidence that the interrogation was not so psychologically coercive that Willis' free will was overborne"); United States v. Artis, 2010 WL 3767723, *9 (D.Vt. 2010) ("there is clear evidence that Mr. Artis's will was not in fact overborne. When he was repeatedly confronted with law enforcement's disbelief regarding his account of how he obtained the firearm, he refused to change his story even when told that untruthful statements could be charged as a crime"). Nor does the totality of the circumstances demonstrate that his statements were coerced.

**2.      Were Iverson's Statements Taken in Violation of <u>Miranda</u>?**

It is undisputed that Iverson was not given <u>Miranda</u> warnings during the encounter at his apartment on October 22, 2014. However, "<u>Miranda</u> warnings are due only when a suspect interrogated by the police is 'in custody.' " <u>Thompson v. Keohane</u>, 516 U.S. 99, 102 (1995). *See* <u>Weaver v. Brenner</u>, 40 F.3d 527, 534–35 (2d Cir. 1994) ("[T]he protections of

the Fifth Amendment apply during custodial interrogation of a criminal defendant, since that is

when criminal proceedings begin").

        In determining whether Iverson was in custody, I must first determine "whether a

reasonable person would have thought he was free to leave the police encounter at issue. If the

answer is yes, the <u>Miranda</u> inquiry is at an end; the challenged interrogation did not require

advice of rights." <u>United States v. Newton</u>, 369 F.3d 659, 672 (2d Cir.), <u>cert</u>. <u>denied</u>, 543 U.S.

947 (2004). If the answer is no, I must next consider "whether, in addition to not feeling free to

leave, a reasonable person would have understood his freedom of action to have been curtailed to

a degree associated with formal arrest . . . . Only if the answer to this second question is yes was

the person 'in custody'". <u>Id</u>.

        "In determining whether a suspect was in custody, we look at all the

circumstances surrounding the interrogation." <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 243 (2d

Cir.1998). Among the factors to be considered are "whether a suspect is or is not told that she is

free to leave . . . the location and atmosphere of the interrogation . . . the language and tone used

by the police . . . whether the suspect is searched, frisked, or patted down . . . and the length of

the interrogation". <u>Id</u>. at 244.

        I conclude that no reasonable person would have considered their freedom of

action to have been curtailed to a degree associated with formal arrest, and that Iverson was

therefore not in custody at the time of his statements. It is undisputed that Iverson was not

handcuffed or physically restrained, and that the agents did not draw their weapons. *See* <u>United</u>

<u>States v. Mitchell</u>, 2012 WL 6827387, *10 (W.D.N.Y.2012) (Feldman, M.J.), <u>adopted</u>, 2013 WL

132459 (W.D.N.Y.2013) (Larimer, J.) (concluding that the defendant was not in custody where,

he "was never handcuffed, a form of restraint 'generally recognized as a hallmark of a formal arrest' . . . never advised . . . that he was under arrest or was going to be arrested, weapons were never drawn or displayed . . . [and] was physically never touched or restrained by law enforcement during the highway encounter").  Iverson was also in familiar surroundings - his home. "[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial."  Newton, 369 F.3d at 675.

To the extent Iverson is also challenging his post-arrest statements made while being transported in Officer Arlington's patrol vehicle, those statements plainly occurred while he was in custody.  However, as the government argues, those were spontaneous statements that were not the product of interrogation.  See Wolfrath v. LaVallee, 576 F.2d 965, 973 n. 6 (2d Cir.1978) ("Miranda . . . is inapplicable, for spontaneous statements which are not the result of 'official interrogation' have never been subject to its strictures").

Therefore, I recommend that Iverson's statements not be suppressed.

## CONCLUSION

For these reasons, I recommend that Iverson's motion to suppress (Scott Affirmation [18], Point I) be denied. Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the clerk of this court by December 28, 2015 (applying the time frames set forth in Fed. R. Crim. P. ("Rules") 45(a)(1)(C), 45(c), and 59(b)(2)).  Any requests for extension of this deadline must be made to Judge Vilardo.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision".

Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(b)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or  identifying the new arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

Dated: December 11, 2015

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge