UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                    14-CR-197

      v.                               DECISION AND ORDER

ELIJAH IVERSON,

            Defendant.
_____

The motion before this Court tells a story of a man and his dog, and it asks whether their actions violated the Fourth Amendment.  The man is Town of Tonawanda Police Officer Brent Costello.  The dog is Tank, a "dual purpose" service K-9 trained to track suspects and detect narcotics.

## Procedural Background

A grand jury indictment charged defendant Elijah Iverson with, among other things, possessing cocaine and marijuana with intent to distribute them in violation of 21 U.S.C. § 841(a)(1).  *See* Docket Item 10.  Iverson moved to suppress physical evidence seized on October 22, 2014, after Tank alerted police officers to the presence of drugs in Iverson's apartment.  Although Iverson does not dispute that the human police officers had permission to enter his apartment to follow up on a 911 call he made, he argues that this permission did not necessarily extend to their drug-detecting dog.  Iverson also moved to suppress incriminating statements that he made during this encounter and to suppress physical evidence seized during the execution of a search warrant the following day.

The magistrate judge assigned to handle pretrial proceedings in this matter, Hon.

Jeremiah J. McCarthy, conducted a suppression hearing on June 18, 2015, and July 20,

2015, during which three police officers testified.  *See* Docket Items 41 & 43.  Iverson

did not testify but submitted an unsworn declaration in support of his motion to

suppress.  Judge McCarthy thereafter issued a Report and Recommendation

recommending denial of the defendant's motion in its entirety.  *See* Docket Item 59.

Iverson now has objected to the Report and Recommendation, requiring this

Court to review this matter *de novo.  See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b).

The Court may accept the magistrate judge's recommendations, reject them, or modify

them, either in whole or in part.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3). For

the reasons set forth below, the Court (1) accepts Judge McCarthy's recommendation

to deny the defendant's motion to suppress physical evidence seized on October 22

and 23, 2014, and (2) likewise accepts his recommendation to deny the defendant's

motion to suppress statements.

**Facts**

On the evening of October 22, 2014, defendant Elijah Iverson called 911 to

report that a suspicious, armed man attempted to enter his apartment building in the

Town of Tonawanda.  *See* Docket Item 47 at 9, 45.  Town of Tonawanda Police Officers

Frank Bartolotta and Mark Muscoreil were dispatched to the scene and were the first

officers to arrive.  *See id.* at 45-47.  While Officer Muscoreil secured the perimeter of the

building, Officer Bartolotta spoke to Iverson.  *See id.* at 47-49.

Iverson said that he met a woman named Candy at a nearby liquor store earlier

that night.  *See id.* at 26, 51.  Although his story is not entirely clear from the record,

Iverson seemed to suggest that Candy set him up to be robbed.  *See id.*  Iverson said

that he later observed Candy and the suspicious man in a hallway, or on a landing,

outside his second-floor apartment.  *See id.* at 12, 26, 51.  He said that Candy and the

suspicious man eventually left without directly threatening him or entering his

apartment.  *See id.* at 26, 51.

After hearing Iverson's story, Officers Bartolotta and Muscoreil left to check the

video surveillance at the liquor store.  *See id.* at 50-52.  At about the same time,

sometime between 10:30 and 10:45 p.m., Officer Jason Arlington arrived at Iverson's

apartment.  *See id.* at 9, 17-18.  He kept the area secure until Officer Brent Costello and

his dog, Tank, arrived at about 11:00 p.m.  *See id.* at 20.

Earlier that evening, Officer Costello and Tank had unsuccessfully tried to track a

suspect in a reported robbery that occurred about two miles from Iverson's apartment.

*See* Docket Item 46 at 11-12; Docket Item 47 at 9-10, 46.  Officers Bartolotta and

Muscoreil believed—at least initially— that the suspect from the earlier robbery also

may have been the subject of Iverson's 911 call "because the descriptions [of the

suspects] were very similar."  *See* Docket Item 47 at 52-53.  Officers Arlington and

Costello were briefed on this at or before the time they arrived at the apartment.  *See*

Docket Item 46 at 12-13, 60, 66-67; Docket Item 47 at 17-18, 20-21, 26, 53-54.

Officer Costello and Tank proceeded to trace the perimeter of Iverson's

apartment building and adjacent areas in an unsuccessful attempt to find a "workable

odor" to track the suspect.  *See* Docket Item 46 at 14-16, 63, 67, 75-77.  Officer

Arlington accompanied them.  *See* Docket Item 47 at 20. Officer Costello also directed

Tank to search for any discarded firearm, but Tank did not locate anything.  *See* Docket Item 46 at 16-17.

In the meantime, Officers Bartolotta and Muscoreil finished viewing the surveillance video from the liquor store.  *See* Docket Item 47 at 52.  Because they did not observe a woman matching Iverson's description of "Candy" in the video, they started to question Iverson's story.  *See id.  A*t 11:23 p.m., Officer Bartolotta began typing a report from his vehicle, which was parked in front of Iverson's apartment building.  *See id.* at 54-55, 60.  The report indicates that Officer Bartolotta had a hunch that Iverson had concocted a "vague" and "untrue" story about meeting a woman named Candy at the liquor store to hide the fact that Iverson was "selling drugs out of the apartment."  *See id.*; Docket Item 45-11.  Officer Bartolotta did not communicate this hunch to Officer Costello, however.  *See* Docket Item 46 at 70.

When he and Tank finished trying to track the suspect outside Iverson's apartment, Officer Costello "told Officer Arlington [he] wanted to go upstairs and talk with the complainant" to see if he could provide "any further information on . . . where the suspect might have ran to or gone."  Docket Item 46 at 18.  As Officer Costello testified, he wanted "to do one . . . last ditch effort to try to find the guy that had a gun" and "to exhaust the search as best [he] could for the suspect."  *See id.* at 18-19; *see also* Docket Item 47 at 11.  Both he and Officer Arlington denied any ulterior motives in going to Iverson's apartment, such as searching for contraband.  *See* Docket Item 46 at 20, 23, 108-09; Docket Item 47 at 16.

Officers Costello and Arlington, along with Ken Englert, another officer who had responded to the scene, then proceeded to Iverson's apartment with Tank in tow.  *See*

Docket Item 46 at 19.  Officer Arlington called out for Iverson and knocked.  *See id.* at

83; Docket Item 47 at 12, 28.  Iverson responded, "come in, it's open."  *Id.* at 19-20, 83;

*see also* Docket Item 47 at 12, 28-29.  The officers did not announce that they had a

dog with them.  *See* Docket Item 46 at 22, 83-85.  According to Officer Costello, Iverson

then "came to the door . . . and everyone walked into the apartment."  Docket Item 46 at

83.  Officers Arlington and Englert entered first, followed by Officer Costello with Tank

tethered to his gun belt on a four-foot leash.  *See id.* at 20, 27; Docket Item 47 at 28-29.

Iverson had a clear line of sight to Tank and did not object to the dog's entry.  *See*

Docket Item 46 at 22, 83-85.

Officer Arlington asked Iverson about "another possible spot the suspect had run

from or to."  *Id.* at 26.  Along with Officer Englert, Iverson and Officer Arlington then

moved to the living room while Officer Costello and Tank remained in the "hallway

entrance area" of the apartment.  *See id.* at 26-27, 44-45, 85, 99.  From his location in

the living room, Iverson still had a clear sight line to Tank.  *See id.* at 26.

Officer Costello testified that he took Tank to Iverson's apartment for the purpose

of officer safety and that he generally keeps Tank with him whenever he can.  *See id.* at

20; Docket Item 47 at 27.  Tank is a "dual purpose" canine, however:  not only can he

perform patrol work, including protecting officers and tracking suspects, but he also can

detect drugs.  See Docket Item 46 at 90-91.[1]  With respect to the latter, Tank can be

---

[1] In December 2009, Officer Costello and Tank completed a 15-week training program
for Tank to become certified as a service K-9.  *See* Docket Item 46 at 7-8.  Since then,
they have completed regular maintenance training and biannual recertifications.  *See id.*
at 8; Docket Items 45-9 & 45-10.  According to Officer Costello, a fully-trained dog such
as Tank is worth between $50,000 and $60,000, and it would be cost-prohibitive for the
department to maintain a larger number of dogs with only a single purpose.  *See* Docket
Item 46 at 91.

commanded to actively search for drugs.  *See id.* at 23-24, 26.  But Officer Costello never gave that command, and Tank remained tethered at his side while they were in Iverson's apartment.  *Id.* at 27-28.

Nevertheless, Tank became excited and started to bark after being in the apartment for about five minutes.  *See id.* at 27-28, 86-87.  Officer Costello understood that to mean that Tank smelled the odor of narcotics, and he so informed Officer Arlington.  *See id.* at 27-29, 44-45; Docket Item 47 at 31.

The officers then told Iverson that "there's something in here that shouldn't be in here" and asked what it was.  Docket Item 46 at 29; *see id.* at 46, 91-92.  Iverson eventually responded that he had an eighth of an ounce of marijuana in the apartment; when he was asked where, he motioned to the kitchen.  *See id.* at 30, 46, 92-93; Docket Item 47 at 13.  Officers Costello and Arlington then followed Iverson to the kitchen.  *See* Docket Item 46 at 30; Docket Item 47 at 13, 31-32.

As Iverson opened a drawer and removed a bag of marijuana, Officer Costello observed a scale.  *See* Docket Item 46 at 31-32; Docket Item 47 at 13.  When Officer Costello asked "what else was in the drawer," Iverson responded that it was "his personal stuff . . . . [a]nd he was trying to basically keep that because he didn't want to give it up.  That was the good stuff."  Docket Item 46 at 30-31.  Officer Costello said "we're going to take that, too," and a scale and two more bags of marijuana were removed from the drawer.  *See id.* at 31-33.

Officer Costello then told Iverson that he believed that there were more narcotics in the apartment and that he was "going to get a search warrant if [he] had to finish searching the apartment."  *See id.* at 31-32.  At that point, Iverson "dropped his

shoulders, shrugged and said he [had] a little powder." *Id.* at 32.  When asked where

the "powder" was located, Iverson pulled out a bag of cocaine from a drawer next to the

one that had contained the marijuana and scale.  *See id.*  Officer Costello saw a larger

baggie containing a white substance and asked "what's that?"  *See id.* at 33.  Iverson

stated that it was "cutter" and turned over the rest of the drawer's contents.  *See id.* at

33-34, 47-48.

Officer Costello next asked Iverson for consent to search his apartment, telling

him, "if I don't get consent . . . I'll go for a search warrant and we'll go from there."  *See

id.* at 34-35.  He told Iverson that Iverson would be given "an appearance ticket . . . if

[Iverson consented] to search as long as it wasn't . . . a felony level amount of

narcotics."  On the other hand, if the officers were required to get a warrant, Officer

Costello said, "there's going to be no appearance tickets, you will go back to the station,

they're going to secure the apartment and based on whether a warrant is issued or not,

the search will be continued."  *Id.* at 35; *see id.* at 49-50.  Iverson did not consent to the

search.  *See id.* at 36-37, 48.

A short time later, a field test confirmed that one of the substances was cocaine,

and the officers arrested Iverson.  *See id.* at 37-38, 50; Docket Item 47 at 14.  Officer

Arlington then took Iverson to the police station.  *See* Docket Item 47 at 14-15.

According to Officer Arlington, during the trip Iverson spontaneously said, "man, they're

really gonna tear up my apartment, aren't they, Officer?"  *See id.* at 15.  Officer

Arlington responded that "they don't just tear up your apartment unless the K-9 alerts to

something and if he alerts it's possible that something that they can't get at that they

would have to go in and damage something depending on where it is." *Id.*  Iverson

replied, "I'm f****ed, I have to find somewhere else to move."  *Id.*

The next morning, the police obtained a search warrant for Iverson's apartment,

supported by an affidavit from Officer Costello that described the events of the previous

evening.  *See* Docket Item 46 at 39, 43; Docket Items 45-6 & 45-7.  During the search,

the police seized crack cocaine, two large baggies of marijuana, $675.00, and a rifle

with ammunition.  *See* Docket Item 45-8.

According to Iverson's unsworn declaration, he "did not authorize law

enforcement to search [his] apartment," Docket Item 19 at 2 (¶ 3), "did not voluntarily

speak to law enforcement," *id.* at 3 (¶ 4), and at "no time was . . . advised of [his]

*Miranda* rights.  *Id.* (¶ 5).

## I.  Motion to Suppress Physical Evidence

### A.  The Dog's Sniff Was Not an Unreasonable Search
in Violation of the Fourth Amendment.

Several times in his objections, the defendant refers to the Supreme Court's

recent decision in *Florida v. Jardines,* 133 S. Ct. 1409 (2013), as holding that "a dog

sniff is a search."  *See* Docket Item 63 at 13-15.  But the late Justice Scalia's opinion in

*Jardines* is not so categorical:  "[W]e need not decide whether the officers' investigation

of Jardines' home violated his expectation of privacy . . . .  That the officers learned

what they learned *only by physically intruding on Jardines' property to gather evidence*

is enough to establish that a search occurred."  133 S. Ct. at 1417 (emphasis added).

In fact, the Supreme Court repeatedly has treated a "sniff by a well-trained narcotics-

detection dog as '*sui generis*'" due to the extremely limited information that it may

reveal.  *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (holding that "the use of a well-trained narcotics-detection dog . . . during a lawful traffic stop, generally does not implicate" the "legitimate privacy interests" protected by the Fourth Amendment"); *United States v. Place*, 462 U.S. 696, 707 (1983).

As the Court explained in *Caballes*:

> Official conduct that does not "compromise any legitimate interest in privacy" is not a search subject to the Fourth Amendment.  [*United States v. Jacobsen,* 466 U.S. 109, 123 (1984)].  We have held that any interest in possessing contraband cannot be deemed "legitimate," and thus, governmental conduct that *only* reveals the possession of contraband "compromises no legitimate privacy interest."  *Ibid.*  This is because the expectation "that certain facts will not come to the attention of the authorities" is not the same as an interest in "privacy that society is prepared to consider reasonable."  [*Id.* at 122 (punctuation omitted)].  In *United States v. Place . . .* we treated a canine sniff by a well-trained narcotics-detection dog as "*sui generis* " because it "discloses only the presence or absence of narcotics, a contraband item."  [462 U.S. at 707; *see also Indianapolis v. Edmond,* 531 U.S. 32, 40 (2000)].  Respondent likewise concedes that "drug sniffs are designed, and if properly conducted are generally likely, to reveal only the presence of contraband."  Although respondent argues that the error rates, particularly the existence of false positives, call into question the premise that drug-detection dogs alert only to contraband, the record contains no evidence or findings that support his argument.  Moreover, respondent does not suggest that an erroneous alert, in and of itself, reveals any legitimate private information.

543 U.S. at 408-09 (emphasis in original).  Thus, although some of the Justices who joined the majority opinion in *Jardines* might have preferred a different conclusion,[2] it

_____

[2] Justice Kagan wrote in her concurring opinion that she "could just as happily have decided" *Jardines* based on privacy interests, not property rights.  *Jardines*, 133 S. Ct. at 1418.  Quoting *Kyllo v. United States,* 533 U.S. 27 (2001), she argued:  "The police officers here conducted a search because they used a 'device . . . not in general public use' (a trained drug-detection dog) to 'explore details of the home' (the presence of certain substances) that they would not otherwise have discovered without entering the premises."  *Jardines*, 133 S. Ct. at 1419.  Indeed, certain language in *Kyllo* suggests that a canine's sniff in a home presents a particularly thorny issue under the Fourth Amendment.  As noted above, the Supreme Court repeatedly has treated the sniff of a well-trained dog as specially unobtrusive because of the limited information it reveals, but *Kyllo* seems to stand for the proposition that privacy in the home is just as specially

still is the law that a well-trained police canine's sniff is a special case that does not

necessarily constitute a search prohibited by the Fourth Amendment.

As Judge McCarthy correctly recognized here, *Jardines* turned on "whether the

officers had an implied license to enter" the defendant's property, "which in turn

depend[ed] upon the purpose for which they entered."   Docket Item 59 at 11 (quoting

*Jardines,* 133 S. Ct. at 1417) (alteration in original).   That is because "[t]he scope of a

license—express or implied—is limited not only to a particular area but also to a specific

purpose."   *Jardines,*133 S. Ct. at 1416.   And while human visitors—even those who are

likely to be unwelcome—have an implied license to approach a home's entry and "wait

briefly to be received," there is "no customary invitation" to deploy "a trained police dog

to explore the area around the home in hopes of discovering incriminating evidence."

*Id.* at 1415-16.   In *Jardines*, the officers went on the defendant's property without a

warrant for the sole purpose of using a dog to detect marijuana.   *See id.* at 1413.

---

protected:  "The Fourth Amendment's protection of the home has never been tied to
measurement of the quality or quantity of information obtained . . . .  In the home, our
cases show, *all* details are intimate details, because the entire area is held safe from
prying government eyes."  533 U.S. at 37 (emphasis in original).

The four dissenters in *Jardines*, however, argued that *Kyllo* is "best understood as a
decision about the use of new technology" that does not apply to the use of dogs for
their acute sense of smell.  *Jardines,* 133 S. Ct. at 1425.  Likewise, Justice Stevens,
writing for the *Caballes* majority, expressly described his opinion as being "entirely
consistent" with *Kyllo.*  543 U.S. at 409.  "Critical to [the *Kyllo*] decision was the fact that
the device was capable of detecting *lawful* activity—in that case, intimate details in a
home, such as 'at what hour each night the lady of the house takes her daily sauna and
bath.'"  *Id.* (citing *Kyllo*, 533 U.S. at 38) (emphasis added).  "The legitimate expectation
that information about perfectly lawful activity will remain private is categorically
distinguishable from . . . hopes or expectations concerning the nondetection of
contraband" that might be revealed by a dog's sniff.  *Caballes,* 543 U.S. at 410.
Especially because the majority opinion in *Jardines* declined to resolve this apparent
disagreement, *Caballes's* treatment of canine sniffs as something unique remains good
law.

Indeed, their "behavior objectively reveal[ed] a purpose to conduct [that] search, which is not what anyone would think he had license to do." *See id.* at 1413.  Therefore, the officers in *Jardines* violated the Fourth Amendment.  *See id.* at 1418.

Consistent with *Jardines,* Judge McCarthy focused on whether the police officers here had an implicit license to enter Iverson's apartment with Tank.  *See id.* at 1415 ("As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question is whether he had given his leave (even implicitly) for them to do so.").  Here, it is undisputed that the human officers had at least an implicit license to enter the apartment.  *See* Docket Item 63 at 9.  Indeed, they were there only as a result of the 911 call that Iverson himself made.  As to their four-footed companion, Judge McCarthy credited Officer Costello's "testimony that Iverson observed Tank enter his apartment and remain without objection," and he therefore found that "Tank had an implicit license to enter."  Docket Item 59 at 11-12 (citing *United States v. Grant*, 375 F. App'x 79, 80 (2d Cir.), *cert. denied,* 562 U.S. 1006 (2010)).  Judge McCarthy also credited "Officer Costello's and Arlington's testimony that they did not enter Iverson's apartment to search for drugs or other contraband."  *See* Docket Item 59 at 12.

Upon a *de novo* review of the record, and especially the transcript of the officers' testimony, as required by 28 U.S.C. § 636(b)(1), this Court agrees that the officers had an implicit license to enter Iverson's apartment with Tank.  Therefore, there was no unreasonable search in violation of the Fourth Amendment.

As noted above, whether the officers had such an implicit license depended on what their behavior objectively revealed.[3]  *See Jardines*, 133 S. Ct. at 1417 (the officers' "behavior objectively reveal[ed] a purpose to conduct a search, which is not what anyone would think he had license to do"); *see also United States v. Gandia*,  276 F. App'x 10, 12 (2d Cir.) (summary order), *cert. denied*, 555 U.S. 930 (2008).  Here, it is undisputed that Iverson called 911 to report a person who may have been an armed robber, and the officers' behavior objectively revealed a purpose to follow up on that request for assistance.

What is more, Tank was with Officer Costello to assist in the search for the suspicious person Iverson reported.  There is no legal requirement that officers with canine companions announce their dogs' training—or leave their dogs behind—when they go somewhere they lawfully may go.  Nor should there be any such requirement. Indeed, such a requirement would put significant burdens on law enforcement, and this Court is not inclined to discourage police officers, such as Officer Costello, from taking their canines with them.  Not only is that practice likely beneficial for officer safety, but it also is likely beneficial for the public's safety precisely because police canines may— and, in fact, are trained to—respond aggressively to certain stimuli.

That is not to say that police officers may bring drug-detecting canines on all their calls in the hope of uncovering narcotics.  When denying a very similar motion to suppress that involved bringing a drug-detecting dog along during the execution of a

---

[3] Although there is some evidence here that certain officers began to suspect Iverson of being a drug dealer by the time that Tank entered Iverson's apartment, those subjective beliefs are not dispositive or even necessarily relevant.  *See Jardines*, 133 S. Ct. at 1417.  In any event, there is no such evidence concerning the officers who actually entered the apartment with Tank.

search warrant for weapons, another district court warned:  "Let me be clear, . . . I do

not endorse the use of a drug-sniffing dog whenever the police obtain a search warrant

listing non-drug related items.  I hold only that, under the particular circumstances of this

case, the police did not act unreasonably in using the dog."  *United States v. Jones*,

2011 WL 294842, at *10 (E.D. Wis. Jan. 26, 2011).[4]  Likewise, there was no

unreasonable search in violation of the Fourth Amendment under the particular

circumstances of this case:  a canine, present in an apartment only as part of a search

for a possible armed robber reported by the apartment's inhabitant, alerted for narcotics

without an order to search for narcotics and while restrained on a four-foot leash near

the entrance to the apartment.[5]  *Cf. United States v. Reed*, 141 F.3d 644, 650 (6th Cir.

1998) ("absent police misconduct, the instinctive acts of trained canines . . .  [do] not

violate the Fourth Amendment"); *United States v. Rivera*, 89 F. Supp. 3d 376, 414

(E.D.N.Y. 2015) ("although the Second Circuit has yet to decide the issue, several

appeals courts have held that no constitutional violation has occurred where a canine's

entry into the car was instinctual rather than orchestrated"); *State v. Miller*, 367 N.C.

---

[4] This pre-*Jardines* decision analyzed *Caballes* and other relevant case law to conclude, with regard to whether the drug-detecting dog in that case had been used to conduct an unreasonable search in violation of the Fourth Amendment, that "the touchstone [was] reasonableness."  *Jones*, 2011 WL 294842, at *10.  "[U]nder *Caballes,* the use of a drug-sniffing dog does not change the nature of an encounter in a constitutional sense, so long as the entire encounter remains reasonable."  *Id.* at *8.  *Jardines* only confirms the correctness of the *Jones* court's conclusion.  In *Jardines,* the Supreme Court expressly was concerned with whether "the officer's conduct was an objectively reasonable search," which "depend[ed] upon whether the officers had an implied licenses to enter the porch, which in turn depend[ed] upon the purpose for which they entered" and what their "behavior objectively reveal[ed]."  *Jardines,* 133 S. Ct. at 1417.

[5] Judge McCarthy reached essentially the same conclusion:  "Unlike in *Jardines*, the conduct here does not objectively reveal that its purpose was to conduct a search:  Officer Costello never directed Tank to locate narcotics, he and Tank remained near the door of the apartment, and prior to Tank's positive alert, the discussion with Iverson focused on locating the reported suspect."  Docket Item 59 at 13.

702, 713 (N.C. Sup. Ct. 2014) (distinguishing between a dog "simply being a dog" and situations where a dog "is acting at the direction or guidance of its handler").  There also is no evidence that Tank was trained to somehow skirt the Fourth Amendment's protections by conducting unreasonable searches on his own initiative.  *See United States v. Sharp*, 689 F.3d 616, 620 (6th Cir.), *cert. denied,* 133 S. Ct. 777 (2012) (acknowledging that "on some level" the dog jumped into a car and alerted for narcotics because of his training, but holding that the inquiry should focus on whether the police specifically trained or encouraged the dog to jump in cars).

In his objections, Iverson argues that the government did not meet its burden of proving that the officers "had an objectively reasonable basis to believe that they had Mr. Iverson's implicit consent to enter" the apartment with Tank and that Judge McCarthy impermissibly "shift[ed] the burden to prove consent to Mr. Iverson."  *See* Docket Item 63 at 9-10.  In support of this argument, Iverson relies on *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990), and similar cases.  *Shaibu* is readily distinguishable, however, because it involved a question of whether, based on the silence of a homeowner who was not a native English speaker, police officers had the homeowner's implicit permission to enter, and later to search, the home.  In contrast, the question here, as it was in *Caballes,* is whether the presence of the drug-detecting dog at a lawful—and indeed *invited*—encounter with police turned the encounter into an unreasonable search.  For the reasons set forth above and in the Report and Recommendation, it did not, and the government met any burden that it had to prove that.

And Iverson offered nothing that refutes the government's evidence.  Iverson's counsel suggests that Iverson may not have known that Tank was a drug-detecting dog and that he may have denied Tank entry if he did.  But Iverson's largely conclusory and unsworn declaration does not even mention Tank, let alone state whether the dog had permission to enter the apartment.  *Cf.* Docket Item 19.

 In sum, this Court reviewed this matter *de novo* and agrees with Judge McCarthy's conclusion "that no Fourth Amendment violation occurred" on October 22, 2014.  *See* Docket Item 59 at 14.  For that reason, the search conducted pursuant to a warrant on October 23, 2014, did not yield the fruit of any poisonous tree.

## B.  The Good-Faith Exception

Judge McCarthy also "analyzed the government's alternative reliance on the good-faith exception of *United States v. Leon*, 468 U.S. 897 (1984)," and found that "the *Leon* good-faith exception to the exclusionary rule applies even if" the search warrant should not have been issued on October 23, 2014.  Docket Item 59 at 14-15.  Like the inquiry into whether Tank's alert constituted an unreasonable search, this inquiry focuses on whether Officer Costello's conduct was objectively reasonable:  "[I]n *United States v. Leon*, the Supreme Court recognized an exception to the exclusionary rule for 'evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant.'"  *United States v. Clark*, 638 F.3d 89, 99 (2d Cir. 2011) (quoting *Leon*, 468 U.S. at 922.).

The Second Circuit has addressed the good-faith exception in a context similar to the one at bar.  In *United States v. Thomas*, 757 F.2d 1359 (2d Cir. 1985), the court

15

found that although a canine sniff at a person's door violated the Fourth Amendment,[6] and although probable cause was lacking for a subsequently issued searched warrant, *Leon* prevented the exclusion of the evidence.   757 F.2d at 1368.   Applying this and other relevant authority, Judge McCarthy credited the officers' testimony and concluded that the officers obtained the physical evidence in objectively reasonable reliance on the October 23, 2014 search warrant.   *See* Docket Item 59 at 17-18.[7]   This Court agrees with his conclusion.

In his objections, Iverson argues that the good-faith exception does not apply because, after *Jardines,* Officer Costello had "a significant reason to believe what he did was unconstitutional."   Docket Item 63 at 14.   He relies on *United States v. Reilly*, 76 F.3d 1271, 1281 (2d Cir.) *aff'd on reh'g*, 91 F.3d 331 (2d Cir. 1996), in which the Second Circuit found that the government was not entitled to rely on the good-faith exception, explicitly distinguishing *Thomas*:

> [U]ntil *Thomas* was decided, no court in this Circuit had held that canine sniffs violated the Fourth Amendment.  Indeed, the Supreme Court had recently affirmed our decision in *United States v. Place,* 660 F.2d 44 (2d Cir.1981), declaring a canine sniff to be "*sui generis* " because it "is much less intrusive than a typical search."   *United States v. Place,* 462 U.S. 696, 707, 103 S. Ct. 2637, 2644, 77 L.Ed.2d 110 (1983).   The officer who

---

[6] Like *Jardines*, and unlike the case at bar, *Thomas* involved officers whose behavior revealed an objective intent to search.   *See Thomas,* 757 F.2d at 1367.

[7] "I credit Officer Costello's testimony that he had no ulterior motive for entering Iverson's apartment and that legitimate purposes existed for why Tank accompanied him - namely, where possible, he regularly took Tank with him when on duty, and in this instance he also provided a measure of protection in that they had not located the suspect.  Moreover, given Iverson's implied consent to Tank's entry and the fact that he was not brought into the apartment for the purpose of conducting a search, there was no reason for Officer Costello to include in the search warrant application that he did not seek or obtain Iverson's permission to bring Tank into the apartment."   Docket Item 59 at 17-18 (internal citations omitted).

> presented the canine sniff evidence to the magistrate was clearly acting in
> good faith in doing so.  He did not have any significant reason to believe
> that what he had done was unconstitutional.

76 F.3d at 1281.  But, as noted above, the decision in *Jardines* was grounded in the fact

that the officers physically trespassed onto the defendant's curtilage with a drug-sniffing

dog while manifesting an objective intent to search for drugs.  *Jardines* did not undo the

treatment of canine sniffs as "*sui generis*" (a principle reaffirmed in *Caballes*, nine years

after *Reilly*), suggest that a dog's sniff of drugs is always a search, or require Officer

Costello to act differently than he did.

And contrary to the defendant's arguments, *Reilly* does not direct courts to be

stricter in analyzing whether the good-faith exception applies to warrants obtained on

the basis of dog sniffs in a post-*Thomas* world.  Reminiscent of *Jardines, Reilly* turned

on the fact that the officers physically trespassed on the defendant's curtilage, then

failed to tell the warrant-issuing judge about that trespass.  *Reilly*, 76 F.3d at 1281.  The

officers "knew very well that large parts of their search were potentially illegal—and yet

they never told the [warrant] issuing judge about it."  *Id.* at 1281-82.  *Reilly* explicitly

distinguishes the officers' conduct in that case from that of "[t]he officer  in *Thomas*,"

who "made clear to the magistrate that he was seeking the search warrant in part on the

basis of a canine sniff."  *Id.* at 1281.  In fact, the Second Circuit posed a hypothetical to

demonstrate the sort of misleading and illegal search involving a dog sniff that would be

analogous to the police conduct in *Reilly*:

> If, in other words, the police in *Thomas* had a) entered the house illegally
> with the dog, b) once inside the house had the dog smell to his nose's
> content, c) then exited and conducted an *ex post* illegal canine sniff
> outside the house, and finally, d) on the basis of this last sniff sought a
> warrant and did so without telling the issuer of the warrant about their
> incursion into the house, that faulty warrant could not possibly justify
> application of the good faith exception.

17

76 F.3d at 1282.  Here, nothing like that occurred.  And here, Officer Costello told the warrant-issuing judge about the basis for the search.

Finally, the exclusionary rule "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence" by the police.  *Herring v. United States*, 555 U.S. 135, 144 (2009).  But there is no such misconduct here, just as there is no good reason to deter Officer Costello and others like him from the general practice of keeping their canine companions with them "as much as possible."  *See* Docket Item 47 at 89.

At the very least, the validity of the search warrant was a close call, making Officer Costello's reliance on it objectively reasonable.  *See United States v. Fugate*, 499 F. App'x 514, 519 (6th Cir. 2012) ("[T]he good-faith exception applies, even if a warrant is based on an illegal predicate search, where 'the facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable.'"); *United States v. Fletcher*, 91 F.3d 48, 51 (8th Cir. 1996), *cert. denied*, 520 U.S. 1121 (1997) ("This circuit has held *Leon* applicable to the subsequent warrant-authorized search of a bag where the original detention violated the Fourth Amendment . . . .  The relevant inquiry is whether the facts surrounding reasonable suspicion are close enough to the line of validity that the police officers were entitled to a belief in the validity of the warrant and the existence of reasonable suspicion").  Under *Leon*, therefore, even if the warrant was invalid, the fruits of the search should not be suppressed.

18

## II.  Motion to Suppress Statements

Iverson also moved to suppress incriminating statements that he made to the police on October 22, 2014, arguing that they were (1) involuntary and (2) the product of a custodial interrogation in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  Upon *de novo* review, I accept Judge McCarthy's finding that all the defendant's statements were not "involuntary" for the purposes of the due process voluntariness test, as well as his conclusion that no *Miranda* warning was required.

### A.  The Defendant's Statements Were "Voluntary."

"[A]part from the issue of custody" and *Miranda* warnings, it is well settled that due process requires the involuntary statement of a defendant to be suppressed.  *See United States v. Connelly*, 2007 WL 3124538, at *8 (W.D.N.Y. Oct. 25, 2007) (citing *Miller v. Fenton,* 474 U.S. 104, 112 (1985)); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000) ("The requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry."); *J.D.B. v. North Carolina*, 564 U.S. 261, 131 S. Ct. 2394 (2011) ("the due process voluntariness test . . . erects its own barrier to admission of a defendant's inculpatory statements at trial").

A statement is not voluntary if "the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing *Haynes v. Washington,* 373 U.S. 503, 513–14 (1963)).  In determining whether a statement is voluntary, courts are to look to "the totality of the circumstances surrounding the statements." *United States v. Siddiqui*, 699 F.3d 690, 707 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2371 (2013).  The "factors that a court should consider ...

center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials."  *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988).

Here, Judge McCarthy found that the officers' testimony regarding their conversations with Iverson was more credible than the conclusory, self-serving statement in Iverson's unsworn declaration that he did not voluntarily speak to law enforcement about the contents of his apartment.  *See* Docket Item 59 at 18-19.  As Judge McCarthy observed, Iverson's will certainly was not overborne:  he continued to refuse his consent when officers asked him to search his apartment, and he forced them to seek a search warrant the following day.  *See* Docket Item 59 at 20 (citing *United States v. Newton*, 2012 WL 170008, *5 (D. Vt. 2012); *United States v. Willis*, 2006 WL 2239738, *6 (W.D.N.Y. 2006); *United States v. Artis*, 2010 WL 3767723, *9 (D. Vt. 2010)).  Moreover, the evidence shows that the officers did not improperly threaten Iverson or induce him to make any statements, and there is no indication that Iverson had any particular characteristics that might have contributed to his statements being involuntary.  And the officers' relatively limited cajoling—offering to issue "an appearance ticket" if Iverson consented to a search—did not elicit incriminating statements and was, in fact, unsuccessful in obtaining his consent.

Iverson highlights the testimony that at one point he had "defeat[ed] body language" and a "reluctance" to show officers the drugs in his apartment.  But posture and an initial unwillingness to cooperate do not mean that statements were involuntary.[8]

---

[8] If this were enough to render statements involuntary, then nearly all statements to the police by criminal defendants might need to be suppressed.  Indeed, Iverson's body language does not even approach the sort of characteristics that courts have found

Especially because the officers did not use any deception or inappropriate threats or promises, and because there is no evidence that the defendant was vulnerable by virtue of his age, health, or intelligence, this Court agrees with Judge McCarthy's finding that Iverson's statements were voluntary.

### B. Because Iverson Was Not in Custody When He Made His Statements, No *Miranda* Warnings Were Required.

"*Miranda's* procedural safeguards exist precisely because the voluntariness test is an inadequate barrier when custodial interrogation is at stake." *J.D.B. v. North Carolina*, 564 U.S. 261, 131 S. Ct. at 2408.  For that reason, even though the defendant's statements were not "involuntary as that term has been defined in the decisions of [the Supreme Court]," the officers' conduct still may have departed "from the prophylactic standards . . . laid down . . . in Miranda to safeguard" the privilege against compulsory self-incrimination.  *Michigan v. Tucker*, 417 U.S. 433, 445-46 (1974).  And if the police conduct did depart from these standards, the statements that resulted should be suppressed.

Here, Judge McCarthy concluded that Iverson was not "in custody" until the time that he was formally arrested.  In doing so, Judge McCarthy relied on a decision involving a traffic stop, *United States v. Mitchell*, 2012 WL 6827387, *10 (W.D.N.Y.2012), *adopted*, 2013 WL 132459 (W.D.N.Y. 2013).  The Supreme Court,

---

render statements involuntary.  *See, e.g., United States v. Taylor*, 745 F.3d 15, 23-25 (2d Cir. 2014) (defendant's statements were involuntary when he ingested a large quantity of Xanax before being arrested, "was in and out of consciousness while giving his statement, and in a trance or a stupor most of the time when not actually asleep," and "the officers' persistent questioning took undue advantage of [his] diminished mental state").  The "decisive issue" in such a situation "is whether the will was 'overborne' by the police, so that the defendant is not using such faculties as he has." *Id.* at 25.

however, has treated traffic stops under their own rubric for the purpose of determining whether a person is "in custody" under *Miranda*.  *See Berkemer v. McCarty,* 468 U.S. 420, 436-37 (1984).  During a traffic stop, there is a reasonable expectation that one will be permitted to go on one's way after a short time, perhaps after receiving a citation. *See id.*  Therefore, more aggressive conduct on the part of the police is required for someone to be "in custody" at a traffic stop.

Nevertheless, there is no evidence that Iverson was in custody, or that a reasonable person in Iverson's position would have believed he was in custody, when Iverson made any statements in his apartment.  First, "interrogations in the familiar surroundings of one's own home" generally are not deemed custodial without a formal arrest.  *See United States v. Falso*, 293 F. App'x 838, 839 (2d Cir. 2008) (internal quotation marks and citation omitted).  When he made the statements at issue, Iverson was not handcuffed or told that he was under arrest.  Indeed, until the officers told Iverson that they would give him an appearance ticket if he consented to a search of his apartment, they did nothing to suggest that he might be arrested – or even charged. See Docket Item 46 at 35-36.  And while the offer to give him an appearance ticket if he consented to a search may have implicitly suggested that he would be arrested if he refused to consent, Iverson did not make any statements after that offer was made.  For those reasons, this Court agrees with Judge McCarthy that no statements at issue were obtained in violation of *Miranda*.  *See Falso*, 293 F. App'x at 839 (home interrogation not custodial even after police found box containing contraband and defendant therefore knew that police had reason to arrest him); *United States v. Bershchansky,* 958 F.

22

Supp. 2d 354 (E.D.N.Y. 2013) (interrogation of defendant "in the familiar surroundings of his own kitchen" was not custodial).

And even if there were a *Miranda* violation, that would not require the suppression of physical evidence.  As the Supreme Court held in *United States v. Patane*, 542 U.S. 630 (2004), "a failure to give a suspect the warnings prescribed by Miranda" does not "require[] suppression of the physical fruits of the suspect's unwarned but voluntary statements."  542 U.S. at 633-34.

Iverson also made statements in the police car after his arrest.  This Court agrees that those statements were spontaneous for the reasons set forth in the Report and Recommendation.

## Conclusion

For the reasons stated above, as well as the reasons in Judge McCarthy's Report and Recommendation which this Court adopts, Iverson's motion to suppress physical evidence and the use of statements is, in all respects, DENIED.

SO ORDERED.

Dated:   February 25, 2016
      Buffalo, New York

*s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE
