UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

UNITED STATES OF AMERICA,

           v.

ELIJAH IVERSON,

           Defendant.

**DECISION AND ORDER**
14-CR-197(LJV)

———————————————————————

## INTRODUCTION

On July 15, 2016, after a three-day trial in this case, the jury returned a verdict of guilty on all five counts against the defendant, Elijah Iverson. Two days earlier, on July 13, 2016, the Court granted the defendant's motion pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), to restore two prospective jurors for whom the government had exercised peremptory challenges. The next day, and before the jury returned its verdict, the government moved "to vacate the *Batson* finding." Docket Item 98 at 1.

## JUSTICIABILITY

Because the jury returned a guilty verdict, that issue could be viewed as moot. "Moot questions are not justiciable and courts do not rule on such questions to avoid issuing advisory opinions." *United States v. Peters*, 754 F.2d 753, 757 (7th Cir. 1985). "A case is not moot, however, where even though the factual controversy is over, the case involves an order 'capable of repetition, yet evading review.'" *Id.* (quoting *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911)).

This exception to the mootness doctrine applies "where (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration; and

(2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Farez-Espinoza v. Napolitano*, No. 08 CIV. 11060HB, 2009 WL 1118098, at *5 (S.D.N.Y. Apr. 27, 2009) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 735 (2008)).  Additionally, "[i]n analyzing whether a matter is capable of repetition yet evading review, courts have considered whether the conflict at issue in the case is a matter of public concern that ought, in the public interest, be decided." *Farez-Espinoza*, 2009 WL 1118098, at *5 (collecting cases).

Here, how courts address the possibility of racial discrimination in jury selection certainly is an issue of public concern.  Moreover, the government is likely to find itself in the same position if this Court again denies one of its peremptory challenges during a short criminal trial—a matter that will continually evade review if the government cannot, or has no reason to, appeal.  In other words, because the denial of a *Batson* challenge is appealable or subject to collateral attack by a defendant whenever the defendant is convicted, courts often have occasion to review any allegedly inappropriate or incorrect denials of such challenges by trial judges.  But the same is not true of decisions to *grant* a criminal defendant's *Batson* challenge:  if the defendant is acquitted there can be no appeal; and if the defendant is convicted, the issue likely will be moot and the government will have no reason to appeal.  For that reason, the issue of the trial court's discretion to grant criminal defendants' *Batson* challenges may well fall between the cracks repeatedly without much opportunity for review.  This Court therefore chooses to consider the government's motion and to use it as a vehicle to reconsider its ruling and to explain its analysis.

**DISCUSSION**

"More than [135 years ago], the [Supreme] Court decided that the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." *Batson*, 476 U.S. at 85 (citing *Strauder v. West Virginia*, 100 U.S. 303 (1879)). And more than 30 years ago, in *Batson v. Kentucky*, the Supreme Court extended that principle to preclude a prosecutor's "purposeful or deliberate" use of peremptory challenges to exclude members of a "cognizable racial group" from a jury. 476 U.S. at 84 (quoting *Swain v. Alabama,* 380 U.S. 202, 203-04 (1965)). *Batson* established a three-step procedure for evaluating whether a prosecutor's peremptory challenge violated the Constitution, which the Supreme Court later summarized as follows:

> First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination."

*Johnson v. California*, 545 U.S. 162, 168 (2005) (internal citations omitted).

The Supreme Court expressly recognized, however, that lower courts necessarily would play a role in deciding how to implement this procedure. *Batson*, 476 U.S. at 99 n.24 ("In light of the variety of jury selection practices followed in our state and federal trial courts, we make no attempt to instruct these courts how best to implement our holding today."); *see Powers v. Ohio*, 499 U.S. 400, 416 (1991) ("It remains for the trial courts to develop rules, without unnecessary disruption of the jury selection process, to permit legitimate and well-founded objections to the use of peremptory challenges as a

mask for race prejudice."). The Second Circuit has interpreted the test this way: "*Batson* challenges may be brought by defendants who can show that racial discrimination was a substantial part of the motivation for a prosecutor's peremptory challenges, leaving to the prosecutor the affirmative defense of showing that the same challenges would have been exercised for race-neutral reasons in the absence of such partially improper motivation." *Howard v. Senkowski*, 986 F.2d 24, 30 (2d Cir. 1993).

Here, the government argues that I "erred in [my] application of the *Batson* standard" by "making a value judgment regarding the strength of the race-neutral reason offered by the prosecutor." Docket Item 98 at 6 ("What is required is 'not a reason that makes sense' . . . even a 'silly or superstitious' reason will satisfy the second step . . . .") (quoting *Purkett v. Elem*, 514 U.S. 765, 768, 769 (1995)). The government also argues that I erred at step three because "it cannot be said that the defendant carried his burden to establish that the government's stated reasons for exercising its challenges were a pretext." Docket Item 98 at 7-8. Finally, the government objects to what it calls my "unfounded—albeit implied—conclusion that the government's attorneys in this case somehow acted in derogation of the oath they took to uphold the Constitution of the United States." *Id.* at 9.

In sum and substance, I believe the government incorrectly views *Batson* as limiting my authority to invoke the Equal Protection Clause during jury selection only to instances when a prosecutor is "being 'racist,'" Docket Item 98 at 8 (citing transcript), or to cases that involve—borrowing language from a recent law review article—"unapologetically bigoted or painfully unimaginative attorneys." *See* Jeffrey Bellin & Junichi P. Semitsu, *Widening Batson's Net to Ensnare More than the Unapologetically*

4

*Bigoted or Painfully Unimaginative Attorney*, 96 Cornell L. Rev. 1075 (2011).  I see *Batson* as establishing latitude more expansive than that.[1]

When *Batson* was decided, Justice Marshall expressed his concerns that trial courts would "face [a] difficult burden" in "assessing prosecutors' motives," and that "the protection erected by [*Batson*] may be illusory."  *Batson*, 476 U.S. at 105-06 (Marshall, J., concurring).  History has proven those concerns to be well founded.  Writing approximately 20 years later, Justice Breyer observed that "*Batson* asks judges to engage in the awkward, sometimes hopeless, task of second-guessing a prosecutor's instinctive judgment—the underlying basis for which *may be invisible even to the prosecutor exercising the challenge.*"  *Miller-El v. Dretke*, 545 U.S. 231, 267-68 (2005) (Breyer, J., concurring) (emphasis added).  "Given the inevitably clumsy fit between any objectively measurable standard and the subjective decisionmaking at issue," he therefore was "not surprised to find studies and anecdotal reports suggesting that, despite *Batson,* the discriminatory use of peremptory challenges remains a problem."  *Id.* at 268 (citing numerous law review articles and studies).  Apparently, it remains a problem today, *see generally* Bellin & Semitsu, *supra*, as the government seems to admit in its papers.  *See* Docket Item 98 at 9.

---

[1] *See, e.g., Howard,* 986 F.2d at 29-30; *see also Johnson,* 545 U.S. at 174 (Thomas, J., dissenting) ("According to *Batson,* the Equal Protection Clause requires that prosecutors select juries based on factors other than race—not that litigants bear particular burdens of proof or persuasion.  Because *Batson*'s burden-shifting approach is a prophylactic framework that polices racially discriminatory jury selection rather than an independent constitutional command, States have wide discretion, subject to the minimum requirements of the Fourteenth Amendment, to experiment with solutions to difficult problems of policy.") (internal citations and quotation marks omitted); *State v. Buggs*, 581 N.W.2d 329, 347 (Minn. 1998) (Page, J., dissenting) (describing *Batson* as "establish[ing] the floor for challenging race based peremptory strikes . . . not set[ting] the ceiling").

And the near impossibility of judging the subjective intent of prosecutors is only part of the problem: in addressing the issue of pretext at step three, the district judge will be seen as deciding whether well-meaning, honest prosecutors who appear before the judge on a regular basis are lying when they proffer non-discriminatory reasons for their exercise of peremptory challenges. Indeed, the prosecutors in the case at bar bristled at the Court's ruling, insisting that they exercised the challenges for race-neutral reasons. *See* Docket Item 98-1; *see also* Docket Item 98 at 9. That is understandable, considering that some commentators and attorneys apparently view granting relief under *Batson* as tantamount to "a personally and professionally damning finding of attorney misconduct." Bellin & Semitsu, *supra*, at 1113.

But I do not view the relief granted here as requiring such a finding. If judges are to enforce *Batson* and the Equal Protection Clause meaningfully during jury selection, they must view the task as something more than deciding whether honest lawyers who appear before a judge regularly are lying to the judge's face. And a finding that a defendant is entitled to relief—under the time pressure of trial and after a brief hearing in which an "unworkable and ineffective analytical structure"[2] is used to inquire into a prosecutor's subjective motives—likewise must not be viewed as necessarily a personal or professional condemnation of an attorney. Here, for example, I have no reason to believe that the prosecutors lied to me when they said that they exercised the peremptory challenges at issue for what they believed were race-neutral reasons. But I believed then, and I continue to believe now with respect to one of the two challenges,

---

[2] *Buggs*, 581 N.W.2d at 347 (Page, J., dissenting).

6

that race indeed was a "substantial part of the motivation," *Howard*, 986 F.2d at 30, for the peremptory challenge.

Therefore, and for the following reasons, I grant the government's motion to vacate the *Batson* finding with respect to Juror 16, but I decline to vacate the finding with respect to Juror 6.

### JUROR 16

Juror 16 was a 51-year-old man originally from Jamaica who went to school through only the sixth grade. During jury selection, he said that he could "understand English" and "read a little bit" but that he was not "really a good reader." He said he was married with five children, two of whom still lived in Jamaica. He previously was employed as a "builder," but he was then on disability after being injured on the job. He said that he liked to look at *TIME* magazine and that he sometimes was able to read the articles in it. He made it very clear that he was proud to appear for jury duty because he saw it as "[his] way of giving back."

After the defense moved to vacate the government's peremptory challenge of Juror 16, the government cited the juror's inability to "understand English" and "to read basic English" as the reason for the challenge. In one of the prosecutors' words, "he has a very limited education, never educated after the sixth grade. And I don't believe that a person with that limited education is going to be able to comprehend the sophisticated federal laws that we're talking about here."

In retrospect, I believe that was a race-neutral reason I should have credited during the jury selection process. In fact, we learned later during the trial that, contrary to his answers to questions posed in the jury selection process, Juror 16 could not read

English at all.  When questioned privately during the trial, he admitted exactly that:  he admitted that his wife had to complete the jury form for him because he could not do it himself.  And for that reason, he was disqualified and replaced with an alternate juror.  *See* 28 U.S.C. § 1865(b)(2) (persons are qualified for jury duty unless they are "unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form").

Under the circumstances, I should not have set aside the government's peremptory challenge of Juror 16.  Because Juror 16 was eventually excused, the point is largely moot.  Nevertheless, I grant the government's motion to vacate the *Batson* finding made with respect to the exercise of the government's peremptory challenge on Juror 16.

### JUROR 6

Juror 6 is a different story.  The government claimed to have challenged Juror 6 because he was "sleeping while the Court was giving questions and instructions, literally sleeping.  I mean, completely asleep, head down, eyes closed."  The government insisted that "it was virtually the whole morning" and that "the only time he woke up was when one of the deputies walked by or when the Court directly asked people questions right next to his left or his right."  In addition, the government noted that the juror was late returning to court after lunch.  As a result, the government argued, "he can't follow the Court's instructions.  He can't stay awake.  It's remarkable that he got as far as he has in school.  But he's not qualified to sit as a juror in this case."

Defense counsel disagreed.  He admitted that "I don't know if he was sleeping," but he also noted that he had not been watching Juror 6 "the entire time because I

wasn't focusing on him looking for reasons to exercise a peremptory challenge." Like defense counsel, I did not see Juror 6 "literally sleeping," although I saw him nodding off "at one point in the morning or afternoon session." As I noted, that "is something that's easily corrected." For example, "we can keep our eye on him and make sure that he pays attention during the course of the trial," or I could "give an admonition during the course of the trial that all jurors are to pay attention and stay awake and focus." Moreover, while I agreed that Juror 6 had been late returning from lunch, I noted that he was "only a couple minutes late."

In response, the government offered a second reason for the peremptory challenge—one that convinces me that I was correct in setting aside the challenge under *Batson*: Juror 6 "doesn't have a lot of life experience." More specifically, the prosecutors noted that "he lives at home with mom and dad," and "he's not married." The prosecutors argued that they had challenged "all other white jurors like him," and therefore "[r]ace was not a substantial factor." That proffered second reason illustrates the difficulties posed by the *Batson* test and how well-meaning prosecutors and judges might make and approve peremptory challenges that might appear to be race-neutral but, in fact, are not.

Juror 6's lack of "life experience" appears on its face to be a race-neutral reason to challenge him. What is more, the prosecutors may have well believed in their hearts that they were exercising the peremptory challenge for that race-neutral reason. But race clearly and demonstrably was a factor: while the prosecutors may not have realized it at the time, they did not, in fact, challenge several jurors who lacked "life experience" in ways quite similar to Juror 6. And that is probative of a *Batson* violation.

*See Jordan v. Lefevre*, 206 F.3d 196, 201 (2d Cir. 2000) (credibility of government's explanation for striking a black panelist on the basis of youth and lack of supervisory experience was undermined by the failure to strike "a white panelist of the same age who had been in her job for only eight months and also had no supervisory experience"); *see also United States v. Thomas*, 303 F.3d 138, 145 (2d Cir. 2002) ("Support for the notion that there was purposeful discrimination in the peremptory challenge may lie in the similarity between the characteristics of jurors struck and jurors accepted. Where the principal difference between them is race, the credibility of the prosecutor's explanation is much weakened.") (quoting *Lefevre, supra*).

For example, Juror 61 was a white male eight years younger than Juror 6 who was not married[3] and still lived with his parents. Like Juror 6 he had not served in the military. Like Juror 6 he had a bachelor's degree.[4] Unlike Juror 6, who was interested in art, reading, astronomy, and bowling, Juror 61's interests were limited to sports and music. If Juror 6 lacked "life experience," then Juror 61 lacked such experience and then some.

Juror 59, who eventually became an alternate, was much the same. Like Juror 6, Juror 59 was 30 years old, unmarried, with no children. Like Juror 6, he was a college graduate who had never served in the military. His hobbies were backpacking and brewing his own beer, and he played rugby. The only appreciable difference between Juror 6 and Juror 59 with respect to "life experience" was that Juror 59 lived in his own apartment and not with his parents.

---

[3] Juror 6 said that he was in a relationship.

[4] Juror 6 also had earned a master's degree from the Rochester Institute of Technology in 2011.

10

Juror 50 also had, or lacked, similar "life experience." She was 28 years old, unmarried, and without children. She had not served in the military but had a bachelor's degree and master's degree in education. She taught kindergarten during the school year and served beer at Buffalo Bisons' baseball games during the summer. Her hobbies included snowboarding, going to Buffalo Bills games, and taking care of her puppies. Apart from having "just bought a house," her "life experience" seems little different from that of Jurors 6, 61, and 59.

Of those four jurors with similar "life experience," only the black juror was challenged. And during the course of jury selection, the Court saw other prospective jurors nodding off from time to time. But the only juror challenged for that reason was black.

Now, that does not mean that the prosecutors chose to challenge the black juror and came up with phony reasons to justify doing so. But it does mean that the prosecutors' perception that the black juror lacked the "life experience" of *all* the others was skewed by *something*. And it may well mean that the prosecutors noticed Juror 6 nodding off because their attention was directed toward that juror more than the others. That does not make the prosecutors racist. That does not make the prosecutors liars. But it does suggest that the peremptory challenge of Juror 6 was substantially related to race—perhaps subconsciously or perhaps because the racial difference caused the prosecutors to focus more on Juror 6.

Under the time pressure of trial, my instincts suggested that the peremptory challenge of Juror 6, like the challenge of Juror 16, was substantially related to race. Upon reflection, and after comparing the credentials of Juror 6 to those of Jurors 61, 59,

11

and 50, I have concluded that my instincts on Juror 6, unlike my instincts on Juror 16, were correct.  The prosecutors may not have realized it, but their exercise of a peremptory challenge on Juror 6 was substantially motivated by race.  And for that reason, I decline to vacate the *Batson* ruling with respect to Juror 6.

## **CONCLUSION**

Out of a venire panel of 60 prospective jurors for this trial of a black defendant, three were black.  One of those three was successfully challenged for cause; the prosecutors exercised peremptory challenges on the other two.  So a black defendant, represented by a white attorney and prosecuted by two white prosecutors, faced trial in front of a white judge and a lily white jury.  If the events of this past summer have taught us anything, it is that when it comes to race and the possibility of racial bias, perception may depend largely on one's race and ethnicity.  Of course, that alone would not be enough to preclude a race-neutral peremptory challenge even if that challenge resulted in the exclusion of all minorities from a jury panel.  Here, however, there was more.

Here, the proffered reason of "life experience" was perceived by the prosecutors in a different way for a black juror than it was for very similar white jurors.  Whether they knew it or not, the prosecutors let race play a substantial role in the exercise of their peremptory challenge on Juror 6—perhaps subconsciously, or perhaps simply because they were more focused on Juror 6 because of his race.  That does not make the prosecutors racist, nor does it make them liars.  Indeed, it does not diminish my respect for the prosecutors one iota.  But I believe that I would have abdicated my responsibility had I taken the easy way out and simply accepted the word of good and honest

prosecutors on its face without looking more closely at the underlying motivation behind the challenge.

In order truly to preclude the discriminatory use of peremptory challenges, judges must do more than simply accept the word of the honest prosecutors who appear before them regularly.  It is too easy for prosecutors to convince themselves that they are challenging a prospective juror not because of the juror's race but because of some other factor—a factor that they may not have noticed had the prospective juror been white.  And it is too easy for courts to bless those explanations rather than risk ruffling the feathers of lawyers they like and respect.

For all the above reasons, I grant the government's motion to vacate the *Batson* finding with respect to Juror 16 but deny the motion to vacate the *Batson* finding as to Juror 6.


       SO ORDERED.

DATED:    October 21, 2016
              Buffalo, New York

                                            *s/Lawrence J. Vilardo*
                                            LAWRENCE J. VILARDO
                                            UNITED STATES DISTRICT JUDGE